Case numbers 251849 and 251881, Western Arkansas, Triston Rhodes v. Fulton Thermal. Mr. Carter, if you're prepared, please proceed. May it please the Court, David Carter on behalf of Appellant Triston Rhodes. I have reserved five minutes for rebuttal. Subject to the Court's approval, I will first address our appeal of the District Court's granting of summary judgment on Mr. Rhodes' strict liability and negligence claims, and then turn to Fulton's cross-appeal of the District Court's denial of its motion to exclude expert opinions and to strike supplemental opinions. This case arises out of the explosion of an industrial boiler at a Tyson Food plant in Nashville, Arkansas. Mr. Rhodes was observing a co-worker conduct a monthly safety check on the boiler. They had disconnected the gas supply and shut the boiler down to conduct the first check of a safety feature and were in the process of restarting the boiler. As soon as they restarted it, the boiler exploded, engulfed both men in flames as they stood at the control panel of the boiler, and then blew them out the back door of the boiler building. Of course, they both sustained serious burn injuries. With respect to the summary judgment motion, this, of course, is subject to a de novo review with this Court, interpreting the summary judgment evidence in a light most favorable to Mr. Rhodes as well as any reasonable inferences. With respect to our strict liability claim, there was no direct proof of a defect. This was primarily because Fulton, in violation of NFPA 921, which is an industry standard that governs fire and explosion investigations, failed to Is that standard in the record somewhere? It is, Your Honor. I believe the entire 921 standard is attached in Fulton's motion for summary judgment, and it's referred to in the brief. But I understand what you're going to talk about. We've got the evidence that's destroyed. It makes it hard to follow the standard. It can't really be done. What was left sitting there after the fire and explosion is problematic in any event, but then the destruction after that makes it impossible for anyone to render an opinion. And so we don't have a direct statement that it was unreasonably dangerous and defective at the time that it entered commerce, right? And the only way I guess you could get around that is by looking at an identical or similar product and examining it. That testimony was never put in, so we don't have an expert that says that. In fact, we have an expert who disavows the ability to do any of that because of the nature of the property and its destruction. When you couple that with the fact that there's some allegations that the expert is laying in about ordinary wear and tear and unreasonable maintenance possibility, not inspecting the entire coils, if you put all that together, aren't those things that just sort of undermine the unreasonably dangerous strict liability piece of it almost entirely? And so what you're left with is a negligence claim. Or am I wrong? Because I'm looking at the two pieces and I'm saying, well, if it can happen in the absence of unreasonable dangerousness and we can't present any evidence that it was unreasonably dangerous or defective, I'm trying to figure out how do you marshal the proof to get to the elements of strict liability? And the cases both from the Arkansas Supreme Court and this court indicate that when you have an absence of direct proof, it is sufficient if the plaintiff negates other potential causes of the failure, not attributable fault. Right, which is why I say when he says that there's a failure to inspect and there may be improper maintenance and aren't those other things that you haven't excluded, therefore the claim's gone. Does that make any sense? Well, I would submit that these facts fall within the Farm Bureau versus case court. The case we cite in the brief where a tractor caught fire during normal operation and what the court said in that case, and I believe this court reiterated that in Crawford v. Sears, is that when common experience teaches that an accident wouldn't happen in the absence of a defect, a case can proceed to trial, you know, if we produce evidence negating those other causes. And that's kind of classic race, it's a locator language that has been just added back into products liability. But the problem that I'm seeing, and I will shut up after this because I think you've answered it, but the problem that I see with it is that improper maintenance is something that is an explanation that might otherwise. You see what I'm saying? I believe if the industry, Tyson in this case, the owner of the boiler, was in charge of all maintenance and inspections, that might be the case. But on our facts, Fulton was paid to conduct inspections. And, of course, I'll address that in our negligence claim. We wouldn't be here if it was all Tyson because there would be a workers' comp bar.  Correct, Your Honor. But in the Counsel, let me ask you what troubles me most about the strict liability is the simple testimony of your expert. It could be anything really, you know the testimony. I'm not saying there's a manufacturing, was there a design defect, flat answer, no. It seems like your expert takes away any causation. I think he was testifying honestly because he never laid hands on it or examined it. He couldn't point to one. He did, though, develop the conclusion that a leaking coil caused this explosion. But he's told us many other possible sources. Right. He has a laundry list, pardon me, but he does, of potential ignition sources. And I think under several of the Arkansas Supreme Court cases that that defeats causation. Well, and I know Fulton relies heavily on multiple ignition sources. But, again, the eyewitness testimony was this boiler itself exploded, not any piping components or any other aspects of the boiler room. And so we're left with eyewitness testimony that I would submit proves this unit blow up. But I would turn now to the negligence claim. And it's important, as I indicated, to note that Fulton was also paid to conduct these inspections. Now, three times a year, they didn't even open this boiler up. They checked exterior. Is this the NFPA 87 requirement? That is part of our experts' opinions is that that particular NFPA standard requires testing of closed vessels. Is that one in the record, too? It is, Your Honor. It's in Mr. Casiano's report that's attached in support of our response to the motion for summary judgment. What was the specific or particular failing, according to that requirement? That they did not conduct either any current testing of the coils or hydrostatic testing of the coils that would tell us whether the integrity of the coils was still intact. Okay, does this come down to how good their inspection was two days before this happened? Did they have an inspection two days before this happened? It absolutely does, Your Honor. Okay, so tell me, and I'm not familiar with the record, a typical appellate judge, but please tell me how good an inspection, or better yet, where the negligent failures were in that inspection. Yes, Your Honor. Because they only opened this unit up once a year, and a man would crawl down in it and take a flashlight and look at those coils for 15 to 30 minutes, he could never visualize any of the outside coils and only half of the inside coils, and of course we cite the... Does the record, you have an expert, does the expert say that was possible? To look at more than 25%? Absolutely, and that they should have. Okay, proceed. And so we go 20 years with these coils inside this boiler, never being visualized, never being tested to determine whether they had worn down, whether carbon or coke had built up in them, and of course Fulton was clearly aware of the risk because in the manual that accompanied this boiler in 1999, it says it's important to fix coil leaks as soon as possible because if that hot parathermal oil is exposed to heat and air, it can blow up. We cite two different technical papers in the years between the sale of the boiler and this explosion. Was there anything to indicate that there had been a leak of the fluid? No, Your Honor, not in this boiler, and that's what Fulton says. Well, we never saw any indication that there was a leak, but if you don't properly inspect those coils, you're not going to find it. Well, is it smoke from the... Go ahead. I mean, that seems to be part of the problem here. You have an inadequate, a claim of inadequate inspection, right? And that may be negligent standing alone. And then you look at, well, the elements negligence needs to get us to proximate cause. And I was looking in the record to find a place where your expert would have said, you know, this type of explosion doesn't happen in the absence of a leak. These types of leaks that cause this sort of problem are rare, and it requires some sort of buildup over time. And it seems that an adequate inspection two days earlier would likely have shown that there are faults in the coil and that Fulton could have been in a place to repair this and avoid the harm. And then you'd have the proximate cause. But your expert really never said that. He just said, well, you've got to look at it because you could find it. But when it came to, well, he's a scientist, so he doesn't want to predict what should have been found in that two-day period. And so you're left kind of with this failure to bridge on the proximate cause, perhaps. Well, the district court simply concluded that reasonable minds couldn't endeavor on proximate cause. And I would submit that the mistake the district court made was assuming that the inspections were adequate in the first place. But if you don't have an adequate inspection, the fact that it did not show signs is of no import and doesn't interrupt proximate causation, which is ordinarily a question for the jury. And I believe, Judge Minton, you had a question about the smoke?  Okay. Let's go to your rebuttal time. Okay. Briefly, I'll address the- You know you're in your rebuttal. Yes, sir. Well, then I'll ask you about smoke. If it were a leak, your expert said there should be smoke from the exhaust stack. And that would be observable, right? Actually- In that part of Arkansas. Actually, it would not because the smokestack goes up. It's encased through the top of the building, and there's a smokestack up there. So none of the people in the boiler room had the ability to see what- Yeah, but I said everybody in that part of Arkansas would have seen it, right? Well, not at 2 o'clock in the morning. Yeah, well, okay. Well, I think we're quibbling, but that's your expert's testimony, right? And he acknowledged that there was no inspection show that, and there was no indication there was smoke coming up. That is correct, and I don't believe the record is crystal clear on whether 2 days before when they did a quarterly inspection, anyone visualized smoke at that time. Briefly, on the cross appeal, of course, that's an abuse of discretion. I think we will, subject to any questions the court has, stand on our briefing that the district court followed the Daubert analysis and properly concluded that these opinions should not be excluded and also that both our designation of Mr. Casiano, his supplementation of his opinions, were timely and within the deadlines established by the court, and he supplemented his opinions within, I believe, a week or two of receiving the information he needed to do that. We would ask that the court reverse on the granting of summary judgment and affirm on the other motions. Thank you, Mr. Carter. Mr. Robertson? Good morning, Your Honor. Jim Robertson on behalf of Fulton Thermal Corp., and I would like to begin by correcting the record and pointing the court to the record on actually what happened. If you turn to Mr. Casiano's transcript, which is probably the most read item in this appeal, on page 102 of his transcript, which is also in the appendix at page 137, question, there was not a concussive force described by Mr. Rhodes or Mr. Hamner as a result of the fire, was there? That's correct. They weren't blown out of the building. The walls weren't blown out. This was just a flame.  Okay. And then the witness says, it was what I would describe as a flash fire where it kind of engulfed. The way he described it, he was engulfed all at one time by flames. So the commentary about explosion and blown up, that's not true. And I don't want the court to get confused by that. Yeah. But it was destroyed? It was burned like metal burns in a fire. And there were remnants like you would expect to see, and the photos are in the record for your review. What does the record tell us about why the remnants of the explosion of the device were not preserved or kept available at least? There's limited information. Once the lawsuit was filed and we began discovery and we lined up the Tyson witnesses, I think there were two groups of them in a series of depositions. Those were the questions we asked them. Where is it? And the answers were, I don't know. When this explosion occurred from a timeline perspective, you've got installed in 1999, relevant quarterly inspection in January of 20, annual inspection April 18 and 19 of 20, quarterly inspection a couple days before on July 6, fire on July 9, OSHA inspection July 30 and 31 that my client was invited to, which they attended with the cause and origin expert and with the in-house counsel. At that point, Tyson Foods had lost a plant. It had been shut down for a month. This is a large loss. They had equipment that had to be replaced. In fact, as I understand from the testimony of the Tyson witnesses, the replacement structure was essentially done as they were doing this, beside the former structure that was labeled the Fulton Boiler Room, which these are not actually pressurized boilers. These are heaters. It's not the container itself, which is large enough to put a ladder in and a man climb down in. Those were not pressurized vessels. That's a little bit deceiving. During that inspection, right in the heart of COVID, it was different. People were in masks. There was distancing. The OSHA guy came in for two days. This is all on the record. They collected certain remnants that were preserved. There were no answers at that point and then silence until years later when the lawsuits filed. That's when the questions started up again and when my client retained me to find out what happened. All we can discern is somebody at Tyson made the decision to discard the remnants of the fire. My client was the target from Tyson. If they were looking for someone to pay for their lost building, for their lost production, and for the workers' compensation claim for all the medical bills that were paid to these two workers, as well as lost benefits, they were going to look to somebody to get that money back. That was my client. The relationship between Tyson and Tristan Rhodes, to that extent, was aligned. It's apparent, we can deduce, that Tyson decided there wasn't proof there to tie my client to that fire. Then the lawsuits filed. We dive back in. The proof of the product itself, the court's already fully aware. Mr. Caggiano had no proof of a design defect. There's no evidence of an alternate design. If there was one, he didn't. What about the race-ipsa type of logic that this is not the sort of thing that just happens? Twenty years later, if this was a brand-new car that burned within a few thousand miles, that's the type of proof you'll see in the Arkansas cases, which I know you're aware of from way back on the Court of Appeals in the 90s. That's not here. This is a 20-year-old product that's been tested hundreds of times and examined hundreds of times by Tyson's personnel and their engineers. They even drafted their own manuals. That's in the record. Was there anything in the record about this model or this particular type of boiler that had had issues in other places? No. One of the Fulton witnesses was aware of one other one. I don't even know if it's exactly the same, but he described a coil that had popped. It was an imbalanced system, and it was new. It wasn't 20 years old. It was in the initial phases of being used, and they found where there was a setting or something wrong. There was a reference to balancing. The court actually referred to it in her opinion when she drafted that. But on those lines, excluding all to get to the point where if you don't have the direct proof, there's certainly no manufacturing defect. There's no evidence of a design defect. So do you rule out all other causes? And Mr. Caggiano's method of doing that, he doesn't rule them out. He ignores them, and that's not what the law allows. I think he acknowledges them. I think ignoring them is the wrong verb, counsel. I would disagree. He discounted them without giving them any merit. He says the only witness, so the accident occurs, the two gentlemen are in there. Mr. Hamner is the primary guy who is training Mr. Rhodes, Mr. Carter's client. They turn off the gas. They're going to ignite it again. They hear a clang or a bang, like something falling, metallic striking something else. And I'm paraphrasing that, but that's the gist of it. And then Mr. Hamner sees a puff of white dust. He doesn't say vapor. He doesn't say smoke. He says dust. He said it looked like talcum powder or words to that effect. And what Mr. Caggiano does is say the witness is wrong. It had to be vapor. Well, that's not proof. That's a thought inside Mr. Caggiano's head without any testing whatsoever. The proof is dust. And I'm not saying the flour, which is flammable. You guys have seen that in the record. I'm not saying that was the cause. But we have other proof in the record that Tyson cleaned the roof nightly of the main facility because they knew the flour was highly flammable. But they never cleaned the roof or the structure involving the Fulton Bull Room adjacent to it. And they hadn't done so since 1981 when it was installed. There are fans in that system that pull the air from the external into it. If there's an east wind, the flour dust from the facility that has to be cleaned off the roof nightly is blown directly toward the facility. So it's a factor. You have also the fact that the paratherm fluid that's pumped through the pipes and into the heaters or into the grease vats to cook the chicken, that stuff's everywhere. If you look at the report that's in the record at the appendix at page 508, it's documented that paratherm is on the skid itself. A flammable fluid is on the skid. It's spilling, it's leaking from all these pipes that are Tyson's responsibility. There's testimony from the Tyson personnel and from Mr. Caggiano that there are leaks at the flanges, joints, and junctions throughout the facility. There are dozens of ignition points in the room where this occurred. There's fuel everywhere. And it's just kind of false for Mr. Caggiano to say, well, none of that matters. None of the proof matters. What really happened is my idea that there's a perforation inside an enclosed container that it perforated, the vapor ignited, and then this puff somehow comes out of the system and it ignites again. He never really explained how the fire lit inside the container and didn't concuss and how it somehow was extinguished and then reignited outside. He's just pulling stuff out of the air. He is the poster child for a daubert motion. And we've covered that ad nauseum in the briefing. All those things were really not addressed at all. And frankly, there's a recent case from November, the Bliv versus Charter Oak Insurance. Is it in your briefs, Counselor? Yes, it is. Good. Thank you. Bliv versus Charter Oak Insurance, November 25. That was affirming a trial court's granting of daubert. But the analysis in that case cannot be reconciled with the analysis of daubert in this case. You compare those two side by side, and I like Judge Hickey. We have some excellent district court judges and she's one of them. But I think she's just dead wrong, dead wrong on that. And I'm putting time into that argument. Even though I don't think he gets there on summary judgment, even if you allow all this stuff in, and I'll come back to that, why am I focusing on daubert? Because my colleagues rely on those opinions. It's bad law. It's going to be out there and I think it needs to be addressed in this opinion. You just can't reconcile it unless there's really never any meaningful review and the district court judge always gets to say whether the person testifies or not without meaningful analysis. Now, I want to back up to a couple of things that were said. First off, briefly on the timing of Mr. Caggiano's opinions. When we were developing this case, there were two extensions, I think, it's in the record, to push back the deadline to disclose expert opinions. That was done. Those deadlines were arguably met. Some additional discovery occurred. We booked Mr. Caggiano's deposition on the last business day of discovery. It was on a Friday, March 22nd of 24. Discovery closed on Sunday. It was the last day to do it. I walk in and they hand me an opinion for the first time that's brand new. I'll admit I was mad. I was mad. I was sandbagging. I had no opportunity to talk to a guy named Harry Katoma, former professor at MIT. Did you ask the district court for any relief before we hear your testimony here? No, it wasn't addressed. In fact, her opinion, I frankly expected her to. Excuse me. Did you ask for any relief from what you were upset about? The relief I expected her to do was to enforce her order. No, I'm sorry. Did you ask ASK, did you ask, request, move for any relief from that? The relief I asked for was for her to strike the opinion because it did not come forward. You did move for something. I did. I moved to strike the opinion. When you read her order on that, she didn't say, every district judge has the right to say, things happen in discovery. We're going to push this out. We're going to extend the deadlines. That's not what happened. She enforced her order. Discovery was over. They got to offer that opinion. I do not get the opportunity to offer a rebuttal from Harry Katoma. Discovery is over. If you read the record in its cold form, my client was prejudiced by that opportunity. But back to the main line, I recognize that this court can affirm that opinion without diving into all of that. I would ask the court to consider the erroneous comment on Daubert and how do you reconcile that for us practitioners? How do you reconcile that with Bliv? Here's my question about that, not to be flippant. Historically, we look at district court opinions and say they have no precedential value for anybody. Therefore, that case can be revisited. Those arguments can be advanced at some other time. We usually don't just go around pointing out errors that are non-dispositive after we've already found a dispositive error or whatever. Advisory opinions. I get what you're arguing, but I don't know that we really do that very much. Our reason that we should do it is why? Is it because there's a stray district court opinion by Judge Hickman? I think you affirm summary judgment because even if you accept everything that's true, it can't get there. And then I think you say this argument was made below because it didn't jive with our prior opinions. There's some merit to that, but we don't have to address it today. And that's enough of a signal to the rest of us out there to say, okay, that part of her opinion, even though it's affirmed, that part is probably not something we should hang our hat on. So even a footnote that says we don't reach the question but it's out there, that would be sufficient? I would say there's a valid question there. Words to that effect that says there's a good argument but we're not addressing it today because I understand you're not going to do an advisory opinion. In my last minute, I would like to point out even if you allow everything in, if you say Caggiano can testify, which by the way, his opinions, there's no manufacturing defect, there's no design defect, he hasn't ruled out all other potential causes, there's no way he can get to negligence because there's no staining seen at the quarterly inspection when they're in the tube. If it's leaking, there would be staining that would be seen. And then the smoke issue, they check the smokestack. They also measure the temperatures of the smokestack. That also is evident on page 508 of the record. You'll see that they measure those. If it's on fire inside that machine, those temperatures are going to be different. So there is a way to monitor this stuff. And that's why when I was taking Mr. Caggiano's deposition, why he said, well, it wouldn't have happened at night, and I'm paraphrasing, it wouldn't have happened at night but it would have happened close in time to the fire. Okay, when? Well, probably sometime on July 8th, which is two days after our inspection. No way for us to know of that perforation. Again, the only evidence of a perforation in that coil is in his mind. There's no evidence. There's evidence of fuels and ignition sources everywhere outside of that. There was no concussion, no explosion from the internal of that equipment. There's no explanation for it. Thank you, Mr. Robertson. Thank you for your time, Your Honor. I appreciate your consideration. Mr. Carter, your rebuttal. With respect to what the record shows, Mr. Hamner, the gentleman who was conducting the safety check testified that this unit blew up in their faces. So there is testimony of what happened where the flash fire explosion occurred, and it was right where they were standing looking at this unit. I would also point out that I believe it was Mr. Rhodes. So you're saying it's a matter of dispute between the parties as to whether or not the explosion came from within the boiler or from around the outside? The only eyewitness testimony is it came from the boiler itself. There is no testimony from any source that it occurred anywhere else in that room. Mr. Rhodes did say that he saw some white stuff, which Mr. Caggiano did explain. That's his explanation, is that white stuff was paratherm vapor. When they started that unit, it was blown out the back. That's what the white stuff they saw was, and then the whole unit exploded. The remnants of the event were not recorded. Were there photographs in the record? I'm sorry, Your Honor. Even though the remnants of the device weren't retained, were there photographs? There were, and they're in the record. There are two in particular that show what's left of this unit in the wreck. They never opened it up, never examined it. They just let it get thrown away, and of course we never had the opportunity. Any other questions? Thank you. The court wishes to thank both counsel for the argument that you provided to the court. It's been helpful, so is the briefing. We'll take it into consideration and render a decision in court.